UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 09-244-KSF

C. MARTIN GASKELL                                                                                    PLAINTIFF

v.                                            **OPINION & ORDER**

UNIVERSITY OF KENTUCKY                                                                     DEFENDANT

\* \* \* \* \* \* \* \* \* \*

Currently before the Court is the motion of the defendant, the University of Kentucky ("UK"), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure [DE #41]. This motion is fully briefed and ripe for review. Also before the Court is the motion of the plaintiff, C. Martin Gaskell ("Gaskell"), for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure [DE #18]. This motion is also fully briefed and ripe for review. For the reasons set forth below, both motions will be denied.

**I.      PROCEDURAL BACKGROUND**

This civil action arises out of the 2007 search and selection of a founding director for UK's MacAdam Observatory. Gaskell applied for the position and was not hired. Instead, UK hired Timothy Knauer, a former student and employee of UK's Department of Physics & Astronomy. Although UK concedes that Gaskell had more education and experience, it contends that it hired Knauer because he demonstrated more of the qualities that UK wanted in its Observatory Director. Gaskell, however, contends that he was rejected for the position because of his religious beliefs and

his expression of these beliefs in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*, as amended.

Gaskell filed this civil rights action on July 10, 2009 [DE #1]. UK denies Gaskell's allegations that it rejected Gaskell because of his religious beliefs. Discovery has been conducted and has concluded, and the parties have filed these motions for summary judgment. In support of its motion for summary judgment, UK presents two discrete arguments [DE # 41]. First, UK argues that it is entitled to summary judgment on all of Gaskell's claims because there are no issues of fact on whether Gaskell was rejected for employment as Observatory Director on the basis of his religious beliefs. Second, UK argues that Title VII's safe harbor applies in this case. Essentially, UK contends that it could legally disqualify Gaskell on the grounds that it could not reasonably accommodate his religious beliefs in an outreach position which would allow him to use his affiliations with UK to promote his religious beliefs.

Gaskell has filed his own motion for partial summary judgment [DE #18]. He argues that the record compels a conclusion that his construed religious beliefs was "a motivating factor" in UK's decision not to hire him. Therefore, under the "mixed-motives" provision of 42 U.S.C. §2000e-2(m), Gaskell argues that he is entitled to partial summary judgment.

## II. FACTUAL BACKGROUND

The parties have presented the Court with pages of evidence and deposition testimony describing the factual background underpinning UK's search and selection for an Observatory Director. To a large extent, "what" happened is largely undisputed. Rather, it is UK's motivation - the "why" - for rejecting Gaskell and hiring Knauer that remains hotly contested.

The case arises out of UK's decision to design and construct an astronomical observatory. Although UK had not had an astronomical observatory for many decades, individuals associated with the UK Department of Physics & Astronomy lobbied the university to build a student observatory. Leading this effort was UK Professor Keith MacAdam. The observatory, now known as the MacAdam Student Observatory, bears Professor MacAdam's name in recognition of his role in getting the project off the ground and his important financial contributions toward the project. The observatory is a place for learning and research to be shared by faculty, students and the public [DE #33, MacAdam Dep, 10-16].

To begin implementation of the observatory project, the Chair of the Department of Physics & Astronomy, Professor Michael Cavagnero, formed an Observatory Committee to design the observatory, oversee its construction, and search for and hire a Founding Director. At some point early in this process, Professors MacAdam and Cavagnero visited with Gaskell at the University of Nebraska-Lincoln ("UNL"). At UNL, Gaskell had been responsible for obtaining the funding, overseeing the design and construction, and eventually running UNL's student observatory. The student observatory at UNL was built on top of a campus parking garage, an idea that appealed to both MacAdam and Cavagnero, and generated more enthusiasm for the project [DE #39, Cavagnero Dep. 21-22].

The Observatory Committee was comprised of members of the Physics and Astronomy department, including: Cavagnero, an ex-officio member due to his position as department chair, Professor Gary Ferland, Professor Thomas Troland, Professor Keith MacAdam, Professor Nancy Levenson, Professor Isaac Shlosman, and staff members Steve Ellis and Sally Shafer. Professor

Freland served as chair of the Observatory Committee until August 2007, when he left on sabbatical [DE #39, Cavagnero Dep. 23-24].

After construction of the student observatory began, the Observatory Committee began its search for a founding director. Because Professor Freland was on sabbatical, Cavagnero named Professor Troland as Chair of what was now called the Search Committee. According to Troland, the Search Committee's duties were: to review applications; to interview candidates; to discuss their qualifications; and to arrive at an advisory opinion to be forwarded through the chair, Cavagnero, to the dean, Steven Hoch. While the dean's office technically holds the authority to hire, Dean Hoch explained that this role is merely a formality; it is essentially Cavagnero's decision [DE #30, Hoch Dep. 22-23]. However, Cavagnero has said that "[u]ltimately this will be a committee decision." [DE #39, Cavagnero Dep. 28, Ex. 2]

In June 2007, UK posted notice of its intent to establish an observatory with a combination of state and private support, and to hire a founding director to lead the observatory. Specifically, an advertisement for the position was placed on the American Astronomical Association website. The Director position is a non-faculty, staff level position. According to the posting, the expected duties of the director include: supervision of teaching assistants, teaching of introductory astronomy courses, maintenance and operation of the telescope and facility; and interaction with students, employees, staff and the public. The posting listed a master's degree in astronomy or an astronomy-related field of study as a minimum requirement [DE #39, Cavagnero Dep., 17-18, 24]. Cavagnero subsequently added "other desirable qualities" in an August 20, 2007 email to the Search Committee. The qualities were: (1) ability to conduct research projects with undergraduate majors; (2) ability to pursue funding for K-12 teacher education through a program called PIMSER; and (3) ability to

pursue funding for undergraduate research. Because items (2) and (3) "would probably require a Ph.D." according to Cavagnero, a Ph.D. was added as a desirable quality [DE #35, Troland Dep., Ex 5].

Applicants for the position responded to the job posting by completing an online application form. At least twelve people applied for the position, including Gaskell [DE # 21,Gaskell Dep, Ex 4]. Gaskell, a native of the United Kingdom, moved to the United States in 1975 to pursue first a Master's Degree and later a Doctoral Degree at the University of Santa Cruz. He is a professional astronomer with a primary interest in extra-galactic astronomy and, in particular, super-massive black holes and active galactic nuclei. At the time he applied for the position at UK, he was working in a non-tenured position in the Physics & Astronomy Department at the UNL. Although he would have preferred a tenured-faculty post with a higher salary, he decided to apply for the position at UK.

There is no dispute that based on his application, Gaskell was a leading candidate for the position. In fact, Cavagnero wrote to the committee that "Martin Gaskell is clearly the most experienced . . ." and pointed out that "Keith [MacAdam] and I visited him last year to learn how to build an observatory on a parking structure." [DE #35, Troland Dep.Ex.4]. A few weeks later, Troland wrote the committee that Gaskell "has already done everything we could possibly want the observatory director to do." [DE #35,Troland Dep. Ex. 5]. A chart prepared by the Search Committee before telephone interviews were conducted shows that Gaskell easily outranked Knauer in every category [DE #40, Shafer Dep. Ex1].

Following its review of the written applications, the Search Committee began conducting phone interviews. Gaskell's phone interview was conducted by Cavagnero and Troland and covered a variety of topics concerning his qualifications and employment history. Gaskell describes the

5

phone interview as fairly standard and focused exclusively on his interests in astronomy [DE #21, Gaskell Dep. 102-103]. After the phone interviews were completed, the Search Committee ranked the leading candidates on an objective scale, assigning a number score to each of five job criteria. By vote of the entire Search Committee, Gaskell came in first among seven applicants. Knauer tied for third [DE #39, Cavagnero Dep., Ex. 20].

In addition to the phone interview, Cavagnero also requested via email that Gaskell provide additional information related to his employment experience at UNL. Cavagnero had previously been a post-doctoral fellow at UNL and was acquainted with Gaskell's supervisor at UNL, Roger Kirby. Cavagnero requested permission to contact Kirby for a reference; Gaskell asked that he not be contacted. However, upon learning that Gaskell was leaving UNL and was moving to the University of Texas, Cavagnero again requested permission to contact Kirby. Gaskell replied that Kirby would not be a good reference, and requested that Cavagnero refrain from speaking with Kirby and instead forwarded Cavagnero a copy of his most recent evaluation at UNL [DE #39, Cavagnero Dep. Ex. 8-9].

Cavagnero advised the Search Committee of Gaskell's request, but the committee agreed that the importance of contacting the applicant's most recent supervisor outweighed the applicant's wishes. Since Gaskell was no longer in jeopardy of losing his job at UNL, Cavagnero contacted Kirby about Gaskell [DE #39, Cavagnero Dep.91].

Kirby advised Cavagnero that Gaskell's main source of conflict with UNL faculty was his desire to decrease his teaching load. Although Gaskell had been hired primarily to teach, Kirby informed Cavagnero that Gaskell had applied some of his research funding toward the hiring of an instructor to replace him as a teacher so that he could focus more exclusively on research. As a

6

result, Kirby complained that he was placed in the difficult position of having to hire replacement instructors. Kirby further advised Cavagnero that Gaskell often refused to accept the decision of his colleagues and administrators, and found ways to rehash old issues. Cavagnero shared the details of his conversation with Kirby with the Search Committee chair, Dr. Troland [DE #39, Cavagnero Dep. 94-97, Ex. 11-12].

Additionally, during the search process, one of the committee members, Sally Shafer, conducted an internet search for information about Gaskell, and found his UNL website which linked to Gaskell's personal web site containing an article titled "Modern Astronomy, the Bible, and Creation." Shafer circulated the article to the Search Committee. Because the article referenced certain religious topics, members of the committee approached Cavagnero with concerns about whether they could consider Gaskell's statements which they believed blended religious thought with scientific theory [DE #40, Shafer Dep. 20-29].

The Search Committee also became aware of Gaskell's public statements on the scientific theory of evolution. In 1997, Gaskell had been invited to deliver a talk at UK on *Modern Astronomy, the Bible, and Creation*. There is no transcript or recording of Gaskell's lecture; however, Gaskell maintained his lecture notes from the talk. The parties greatly debate exactly what Gaskell personally believes regarding the theory of evolution and the Bible. Although he did not attend the lecture, Moshe Elitzur, an astronomer in the UK Physics and Astronomy Department, informed Cavagnero that one of his colleagues who attended, Gary Ferland, had commented that Gaskell was a "creationist" and did not hide his beliefs. Elitzur was concerned about hiring someone in a position with significant public outreach who was a creationist. He was especially worried in light of the fact

that UK is only 70 miles from a creationist museum and thus likely to create unwanted publicity [DE #34, Elitzur Dep. 8-9]. Gaskell denies that he is a "creationist."

Because Gaskell's lecture notes referenced his UNL affiliation and his UNL website linked to his personal web site which included the lecture notes, Cavagnero was concerned that if Gaskell did something similar at UK, he would be in violation of one of UK's governing regulations concerning the use of one's university position to advance one's private viewpoints. Cavagnero discussed this matter with Kirby, and particularly asked him whether Gaskell's personal religious beliefs had interfered with his duties in the classroom and in the community at UNL. According to Kirby, a handful of students had mentioned in their teacher evaluations that it was refreshing to have a professor who believed in God, but that otherwise Gaskell's views on religion had not interfered with his work [DE #39, Cavagnero Dep 99-103].

Although Cavagnero concluded that Gaskell's views on religion and science should not prevent him from being considered for the position, he consulted with the Dean of the College of Arts and Sciences and with the Provost of the University about whether the committee could consider Gaskell's lecture notes and public statements from his 1997 lecture as part of the hiring process [DE #39, Cavagnero Dep.113 Ex. 15]. Dean Hoch responded that the committee was not to evaluate Gaskell based on questions of religion but since his viewpoint was discussed in a scholarly paper, the committee should consider whether his statements were "good science." The University Provost agreed. [DE #30 Hoch Dep. 30-31].

The committee then undertook a review of the scientific integrity of Gaskell's statements from his lecture notes. Because Gaskell's lecture notes discussed biological principles, Cavagnero decided to consult with some of UK's biology faculty [DE #39, Cavagnero Dep. 151]. He contacted

8

Dr. Jeffrey Osborne, a faculty member in the Biology Department who was involved with outreach missions of the university, and asked if Gaskell had made scientific statements about evolution that showed a fundamental lack of appreciation for the scientific method and/or for well-established scientific principles [DE #39, Cavagnero Dep. 152]. Osborne in turn solicited input from two of his colleagues, Shelly Steiner, chair of the Biology Department, and Jim Krupp, a faculty member in the Biology Department. After reviewing the lecture notes, the biologists expressed concern to Cavagnero about Gaskell's "creationist" views and the impact these views would have on the university. The biologists further warned that the Biology Department would refuse to cooperate with the Physics and Astronomy Department on the building of an "outreach science team" were Physics and Astronomy to go ahead and hire one of "these types of individuals" [DE #39, Cavagnero Dep. Ex. 35].

The next day, Troland sent Cavagnero an email entitled "The Gaskell Affair." In the email, Troland complains that Gaskell will be denied the job "because of his religious beliefs," that "no objective observer could possibly believe" the decision was based on any reason other than religion, that the whole process causes him to question UK's commitment to "religious freedom." He goes on to predict that "other reasons will be given for this choice when we meet Tuesday" [DE #35, Troland, Ex. 35].

Cavagnero replied to Troland two days later that he disagreed with Troland's analysis of the situation, and presented several other reasons why Knauer was preferable. He acknowledged, however, that the religion issue may have played a part in the decisions of at least two committee members (Shafer and Shlosman) and admitted that he would be "worried" every time Gaskell, if selected at Observatory Director, would be let out in public. [DE #35,Troland Dep, Ex. 37].

9

Moreover, Cavagnero admits that Gaskell's views on evolution were at least one element of his decision. [DE #39, Cavagnero Dep., 199-200].

In the end, the Search Committee recommended Knauer for the position. The recommendation was accepted by Cavagnero, and forwarded to the Dean, who in turn also accepted the recommendation. Knauer was offered the job, which he accepted. He began his duties as Observatory Director in November 2007, and continues to hold the position to this day [DE #39, Cavagnero Dep. 205].

A complaint about the hiring process was first made by Professor Kovash to the UK Equal Employment Office. Although Kovash was not a member of the Search Committee, he did participate in interviews of the finalist candidates and submitted an evaluation. [DE #23, Kovash Dep. 8-9]. This role, and his conversations with Troland led him to believe the search process had been conducted in an unfair and perhaps illegal manner. [DE #23, Kovash Dep.14-24]. Kovash's complaint was investigated, but no action was taken [DE #23, Kovash Dep. 33].

Gaskell also filed a complaint with the EEOC charging UK with religious discrimination. On April 27, 2009, he received a Notice of Right-to-Sue letter from the EEOC [DE #41-34]. He then proceeded with this action.

III.  ANALYSIS

    A.  SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when the moving party can "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence, all facts, and any inferences that may permissibly be

drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

      **B.**      **TITLE VII AND RELIGIOUS DISCRIMINATION**

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, provides that '[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). The term "religion" is defined to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

As in any other discriminatory discharge or refusal to hire case, the plaintiff can establish that he was discharged or not hired on the basis of his religion through direct or indirect means. *Tepper*

*v. Potter*, 505 F.3d 508, 515 (6th Cir .2007). Direct evidence is evidence which, if believed, "requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id*. (citation omitted). Direct evidence "does not require the factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Id.* (citation omitted). Evidence which in and of itself suggests that the person or persons with the power to hire, fire, promote, or demote the plaintiff were animated by an illegal employment criterion amounts to direct proof of discrimination. Remarks to the effect that "I won't hire you because you're a woman," or "I'm firing you because you're not a Christian," are obvious examples of direct evidence of discrimination. *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997). However, other, less obvious remarks, have been found to be direct evidence of discrimination. Remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria can suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality. *See e.g., Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir. 1990); *Robinson v. PPG Indus., Inc.*, 23 F.3d 1159, 1164-65 &nn. 2-3 (7th Cir. 1993). Proof of this nature supports the inference that a statutorily prescribed factor such as religion was at least a motivating factor in the adverse employment action at issue. *Terbovitz v. Fiscal Court of Adair County, Ky.*, 825 F.2d 111,115 (6th Cir. 1987).

If there is no direct evidence of discrimination, then courts rely on the framework established in the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, the plaintiff carries the burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Id*. If the plaintiff is able to prove a prima facie case, then the burden shifts to the

defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id*. If the defendant is able to carry this burden, then the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered were not true reasons but were a pretext for discrimination. *Id*.

### C.  UK'S MOTION FOR SUMMARY JUDGMENT [DE #41]

UK moves for summary judgment on two grounds. First, UK argues that it hired a different candidate for the Observatory Director for reasons that have nothing to do with Gaskell's religion. Because Gaskell has failed to show by a preponderance of the evidence that UK's reasons were a pretext for discrimination, UK contends that, based on *McDonnell Douglas* analysis, Gaskell's claims must be dismissed. Second, UK argues that even if Gaskell's religious beliefs played a role in the hiring decision, UK could legally disqualify Gaskell on the grounds that it could not reasonably accommodate his religious beliefs in an outreach position that would allow him to use his affiliation with UK to promote his religious beliefs. In making this argument, UK relies on the "safe harbor" provision of Title VII which allows an employer to consider religious views if they are unable to reasonably accommodate a prospective employee's religious practices or beliefs without suffering undue hardship on the employer's business. *See* 42 U.S.C. § 2000e(j).

Although UK argues that the *McDonnell Douglas* framework applies to this case, Gaskell contends that he has presented direct evidence of discrimination. The record contains substantial evidence that Gaskell was a leading candidate for the position until the issue of his religion (as Gaskell calls it) or his scientific position (as UK calls it) became an issue. Specifically, he points to the email written by Troland, the Search Committee Chair, to Cavagnero, the Physics and Astronomy Department Chair, just days prior to the Search Committee's vote to recommend Knauer

13

for the position and thereby reject Gaskell. The email, with the subject line "The Gaskell Affair," states:

> It has become clear to me that there is virtually no way Gaskell will be offered the job despite his qualifications that stand far above those of any other applicant. Other reasons will be given for this choice when we meet Tuesday. In the end, however, the real reason why we will not offer him the job is because of his religious beliefs in matters that are unrelated to astronomy or to any of the duties specified for this position. (For example, the job does not involve outreach in biology.). . . If Martin were not so superbly qualified, so breathtakingly above the other applicants in background and experience, then our decision would be much simpler. We could easily choose another applicant, and we could content ourselves with the idea that Martin's religious beliefs played little role in our decision. However, this is not the case. As it is, no objective observer could possibly believe that we excluded Martin on any basis other than religious. . . .

[DE #38, Troland Dep. Ex.35] Certainly, Troland, who was chair of the Search Committee, participated in the interviews of the candidates, discussions of the committee, email exchanges involving the process played an obvious and important role in the decisionmaking process. As he explained to Patty Bender, the University Equal Employment Officer who investigated the complaint of religious discrimination submitted by Professor Kovash:

> I was part of the entire process that led to this decision. I know what observatory committee members said in meetings and privately, not just their e-mail comments. I know that the university (not your office!) chose an applicant with almost no relevant experience over one with immense experience in virtually every aspect of the observatory director's duties. And I know that this choice was made (to a significant extent) on grounds that have nothing to do with the job as advertised nor with the job as envisioned by our department.

[DE#38 Troland Dep., Ex. 45]. His comments, if true, are direct evidence of religious discrimination. Although Troland has subsequently retracted these comments to some extent, they remain direct evidence of religious discrimination. Although UK contends that these comments are inadmissible hearsay, the Court finds that they are admissible under Rule 801(d)(2) of the Federal

14

Rules of Evidence, defining as non-hearsay a statement "offered against a party" that is "a statement by the party's agent or servant concerning a matter within the scope of agency or employment." *See Blair v. Henry Filters, Inc.*, 505 F.3d 517, 527 (6th Cir. 2007); *Carter v. Univ. of Toledo*, 349 F.3d 269, 274-76 (6th Cir. 2003). Additionally, these statements are admissible under Rule 803(3) of the Federal Rules of Evidence.

Additional direct evidence of religious discrimination can be found in the deposition of Cavagnero, who stated that the debate generated by Gaskell's website and his religious beliefs, was an "element" in the decision not to hire Gaskell. [DE #39, Cavagnero Dep., 160:6, 200:1-8]. Also, Professor MacAdam testified in his deposition that Gaskell's "views of religious things in relation to reconciling what is known scientifically about how the world developed and what is represented in the Bible" was "a factor" in his decision not to support Gaskell. [DE #33, MacAdam Dep. 17-, 20]. Steve Ellis, a committee member, stated in his deposition that religion was an "underlying theme in everything we discussed." [DE #27, Ellis Dep. 36:17-20].

Gaskell points to other evidence which suggests a propensity by the Search Committee to evaluate employees based on illegal criteria. For example, early in the search process, before any telephone or personal interviews of the candidates, committee member Shafer sent an email to Troland and Cavagnero containing copies of links to Gaskell's websites and his lecture notes. Her comments in the email include this statement: "Clearly this man is complex and likely fascinating to talk with - but potentially evangelical." [DE #40, Shafer Dep., Ex 4]. Later, Shafer emailed members of the Search Committee, stating "If the job were solely about physics and astronomy and within the university I would strongly agree with you that Martin's beliefs on biology and religion don't matter a hoot and should not figure in the discussion at all." [DE #40, Shafer Dep., Ex. 15].

The negative implication is clear: because the job was not solely about physics and astronomy within the university, Gaskell's beliefs on biology and religion do matter.

Gaskell's allegations, when considered together and taken as true, raise a triable issue of fact as to whether his religious beliefs were a substantial motivating factor in UK's decision not to hire him. With the direct evidence of religious discrimination present in this case, it is not necessary for the Court to engage in the *McDonnell Douglas* burden-shifting framework. However, the Court must now consider UK's argument that accommodating Gaskell's allegedly flawed scientific views, grounded in his religious belief, would create an undue hardship to the university entitling it to protection under the safe harbor provision of 42 U.S.C. § 2000e(j). This section applies in cases where an applicant or employee requests some form of religious accommodation. In this case, UK has not presented any evidence that Gaskell was requesting that UK accommodate any personal religious views. Instead, UK admits that Gaskell voiced his understanding of UK's guidelines and agreed to comply with them. In fact, Gaskell's former chair at UNL informed Cavagnero that "he had never read a complaint about the manner in which Martin [Gaskell] discussed religious issues in the classroom." [DE #39, Cavagnero Dep. Ex. 12]. Finally, Gaskell never indicated any intent to use his past or current positions, or the position of Observatory Director, to advance his religion or to use his affiliation with any university to promote his religious beliefs. In short, Gaskell was not asking to be accommodated. Thus, the safe harbor provision of 42 U.S.C. § 2000e(j) does not apply.

Accordingly, based on Gaskell's presentation of direct evidence of discrimination, UK's motion for summary judgment will be denied. The Court now turns to Gaskell's motion for partial summary judgment.

### D. GASKELL'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO 42 U.S.C. §2000e-2(m) - THE "MIXED MOTIVES" PROVISION OF TITLE VII

In 1991, Title VII of the Civil Rights Act was amended to include, *inter alia*, Section 2000e-2(m). This section provides as follows: an employer commits an unlawful employment practice "when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice. 42 U.S.C. § 2000e-2(m). "[T]he purpose and effect of this section was 'to eliminate the employer's ability to escape liability in mixed-motives cases by proving that it would have made the same decision in the absence of the discriminatory motivation.'" *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 397 (6th Cir. 2008)(quoting *Hill v. Lockheed Martin Logistics Mgmt, Inc.*, 354 F.3d 277, 284 (4th Cir. 2004)). As the Sixth Circuit has stated, "in mixed-motive cases, a plaintiff can win simply by showing that the defendant's consideration of a protected characteristic 'was *a* motivating factor for any employment practice, *even though other factors also motivated the practice.*" *White*, 533 F.3d at 401(quoting 42 U.S.C. §2000e-2(m)(emphasis in original)). The *McDonnell Douglas* burden-shifting framework does not apply to mixed-motive claims. *White*, 533 F.3d at 401-02.

While UK argues that Gaskell did not allege this particular provision in his Complaint, the Court notes that under the notice pleading standards of Rule 8 of the Federal Rules of Civil Procedure, his complaint alleging violations of 42 U.S.C. § 2000e *et seq*. is sufficient to proceed on the mixed-motive provisions of Title VII. A Title VII mixed-motive case can be proved by either direct or circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92 (2003). However, the traditional *McDonnell Douglas/Burdine* burden-shifting framework does not apply to the summary judgment analysis of Title VII mixed-motive claims. *White*, 533 F.3d at 401-02. Rather,

to survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; (2) "race, color, religion, sex, or national origin was *a* motivating factor" for the defendant's adverse employment action.   42 U.S.C. §2000e-2(m)(emphasis added).

There is no dispute that UK's decision not to hire Gaskell was an adverse employment action. The issue, then is whether Gaskell's religion was "a motivating factor."  As set out above, Gaskell has presented direct and other evidence which, if believed, establishes that his religion was a factor in UK's employment decision.  However, UK has also come forward with other evidence that religion was not a motivating factor in its decision to hire Knauer.  UK notes that the only question that was asked of Gaskell regarding his statement on evolution was posed by Cavagnero who was concerned that Gaskell would violate UK policy by representing his own opinion as that of the University should he link his university webpage to his personal webpage containing religious material.  UK contends that the Search Committee did not act improperly when it considered Gaskell's comments about evolution because Gaskell made those comments public not only during his 1997 lecture at UK, but also by posting his lecture notes on his webpage.  UK also contends that it did not consider Gaskell's religious beliefs, only his public comments that there were scientific problems with the theory of evolution.  According to UK, the Search Committee was concerned that these publicly expressed views would impair Gaskell's ability to serve effectively as Observatory Director.

UK's motivation for its decision not to hire Gaskell is very fact intensive and difficult to determine at the summary judgment stage.  Because UK has come forward with more than a scintilla

18

of evidence to support its argument that religion was not a motivating factor in its decision, Gaskell's motion for partial summary judgment will be denied.

## IV. CONCLUSION

For the reasons set forth below, the Court, being fully and sufficiently advised, hereby **ORDERS** as follows:

(1) Gaskell's motion for partial summary judgment [DE#18] is **DENIED**;

(2) UK's motion for summary judgment [DE #41] is **DENIED**; and

(3) this matter **REMAINS PENDING**.

This November 23, 2010.

Signed By:

*Karl S. Forester* KSF

**United States Senior Judge**